THOMAS AINSWORTH, Appellant, *v.* COMBINED INSURANCE COMPANY OF AMERICA, Respondent.

No. 17625

October 26, 1988            763 P.2d 673

[Rehearing denied May 19, 1989]

*Peter Chase Neumann,* Reno; *Bradley & Drendel,* Reno, for Appellants.

*Mortimer, Sourwine, Mousel, Sloane & Knobel,* Reno; *Lionel, Sawyer & Collins,* and *M. Kristina Pickering* and *Steve Morris,* Las Vegas, for Respondent.

*Lambrose, FitzSimmons & Perkins,* Carson City, for Amicus Curiae.

## OPINION

By the Court, GUNDERSON, C. J.:

On January 14, 1982, Thomas Ainsworth was a healthy, working man who also served his community as a member of the Sparks City Council. His only health concerns involved occasional "dizzy spells," which he had experienced at irregular intervals over a period of several years. Within twenty-four hours, Thomas Ainsworth's life was shattered. Because of an accident which occurred during the administration of an angiogram, Thomas suffered a stroke. He immediately went into a coma, which continued for seven days. He was still 100 percent disabled after six months. The stroke did not kill him, but some of its effects are permanent and devastating. He will never walk or talk as well as he previously did.

While Thomas was fighting for his life, his wife, Evelyn Ainsworth, was fighting a different battle. She attempted to collect benefits for Thomas under two accident policies issued by the respondent, Combined Insurance Company of America (Combined). The Ainsworths had been advised by agents of Combined

that their accident policies would protect them in the event of "any conceivable accident." Relying on this promise, and the advice of Thomas' physician, Evelyn sent in an accident claim.

The insurance adjuster who received the claim denied it immediately, without any investigation whatsoever, because the doctor's report hypothesized that the stroke may have been caused by the disruption of atheromatous plaque during the angiogram. The adjuster focused upon this one sentence in the report, and concluded that the development of arterial plaque had contributed to Thomas' stroke. Since the policy excluded any accident which was contributed to by disease, Combined refused to pay benefits under the policies. These benefits amounted to $9,600.

Evelyn was distressed by the denial, but decided to resubmit the claim on advice from her nephew, who was a physician, and from the Combined salesman who came by in June to collect the next biannual premium. Combined's salesman discussed the Ainsworths' financial condition with Evelyn, and encouraged her to resubmit her claim. He even promised to put a hold on the premium check while the matter was cleared up.

The claim was resubmitted, along with a doctor's report which corrected the earlier hypothesis. The doctor stated that the results of the angiogram clearly showed that Thomas' blood vessels were normal and were not built up with atheromatous plaque. He affirmed that the stoke was entirely accidental, and could have resulted from numerous causes.

At this time, Combined sent its file to its medical consultant, Dr. Goldfinger. The consultant was provided, however, only with the first doctor's report and records from Washoe Medical Center, where Thomas had been transferred after the accident. The consultant's one-line report stated that the stroke was the result of disease. After receiving the consultant's report, Combined again denied the claim, without evaluating the second doctor's report or the record summaries from the Veterans Administration Hospital, where the accident occurred. Combined never made further inquiry into the claim, never telephoned or wrote to the doctors, and never obtained a copy of the operating report or the angiogram.

In November, 1982, Evelyn submitted Thomas' claim for the third time, accompanied by yet another doctor's report explaining that Thomas had been the victim of an accident. By this time, the claim file included more records from the V.A. Hospital. The file was sent to Dr. Goldfinger for a second evaluation, but on the same day Combined sent Evelyn a third denial letter. Two days later, Dr. Goldfinger again recommended denying the claim, because the angiogram had been ordered for the purpose of diagnosing Thomas' dizzy spells. Thus, according to Goldfinger, the loss was not "purely accidental."

In a further effort to obtain the badly-needed policy benefits, Evelyn submitted the claim for the fourth time in February, 1983. With her claim she included a letter from her husband's doctor which confirmed that the angiogram "revealed no pre-existing vascular disease." In response to this claim, Combined offered to "compromise" by paying the Ainsworths $1,940 in exchange for a release of all claims. Evelyn understandably refused this offer, and wrote a fifth letter, requesting payment of the full benefits under the two policies, a total of $9,600. Combined still refused to pay.

The Ainsworths then sued Combined, seeking the payment of benefits and compensatory and punitive damages. The jury awarded the benefits, $200,000 in compensatory damages, and $5,939,500 in punitive damages. Combined moved for a judgment notwithstanding the verdict and for a new trial. The district court denied the latter motion, but granted the former, totally eliminating the award of punitive damages. For the reasons expressed in this opinion, we reverse the judgment of the district court and reinstate the jury's verdict. The denial of the motion for new trial is affirmed.

## SUBSTANTIAL EVIDENCE

The function of this court in evaluating a grant of judgment notwithstanding the verdict is to determine whether the jury's verdict is supported by substantial evidence. The party favored by a verdict is entitled to have the evidence interpreted in the manner most favorable to him, and gains the benefit of every inference of fact fairly deducible from the evidence. Stackiewicz v. Nissan Motor Corp., 100 Nev. 443, 686 P.2d 925 (1984); Dudley v. Prima, 84 Nev. 549, 445 P.2d 31 (1968). Judgment notwithstanding the verdict is inappropriate when there is any substantial evidence to support that verdict. Jacobson v. Manfredi, 100 Nev. 226, 679 P.2d 251 (1984).

A jury may award punitive damages where the defendant has been guilty of fraud, malice, or oppression. NRS 42.010. We conclude that the punitive damages award in this case is supported by substantial evidence of oppression on the part of the defendant, Combined. Therefore, we reverse the decision of the district court.

Oppression has been defined as "a conscious disregard for the rights of others which constitute[s] an act of subjecting plaintiffs to cruel and unjust hardship." Roth v. Shell Oil Company, 185 Cal.App. 2d 676, 682 (Cal.App. 1960); *accord* Jeep Corp. v. Murray, 101 Nev. 640, 650, 708 P.2d 297 304 (1985). Our decisions have recognized that such a "conscious disregard" may

support an award of punitive damages. Leslie v. Jones Chemical Co., 92 Nev. 391, 551 P.2d 234 (1976); Nevada Cement Co. v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973). The Ainsworths presented substantial evidence that Combined had consciously and deliberately ignored their rights to the payment of benefits.

The initial claim was denied immediately without any investigation, although Combined claimed in its letter that it had been given "careful consideration." In fact, Combined made no independent inquiry concerning Thomas' accident, whether by telephone or letter. The sum total of its investigative effort was to send a $5 check to each of two hospitals, accompanied by a records request form. This effort was clearly inadequate to support Combined's assertion that it handled the claim properly. Furthermore, we are not impressed by Combined's alleged lack of knowledge concerning the Ainsworths' precarious finances. From the outset, Combined knew that Thomas Ainsworth was a 59-year old male who had suffered a stroke and was comatose for seven days. This information was more than adequate to give Combined notice that its insured, who had paid premiums for 13 years, had an unqualified and urgent need for the benefits of the accident policies. Additionally, five times within 18 months, the insured's wife requested payment, indicating clearly that the policy benefits of $9,600 were urgently needed.

Combined's cumulative response to the next three claim submissions was also sadly inadequate. In spite of the seriousness of the accident, Combined failed to obtain accurate and complete medical records. Although it used the services of a medical consultant, the consultant was not provided with adequate information. When Evelyn sent additional medical reports, these were initially ignored because Combined's employees felt they merely repeated the statements contained in the initial report. After further consideration of the reports and a second outside consultation, Combined continued to deny the claim simply because the angiogram was ordered as a diagnostic tool. We fail to understand why an accident cannot occur during the administration of a medical test. The stroke was an unplanned and unexpected result of the angiogram. The fact that Thomas underwent the procedure on the orders of his doctor is irrelevant. If Thomas had been hit by a truck on his way to doctor's office, the accident would not be the result of a disease, in spite of the fact that Thomas was engaged in seeking medical treatment at the time.

Combined's obstinate and unjustified refusal to pay, in our opinion, constitutes oppression as contemplated by the statute. The evidence establishes that the Ainsworths were in desperate need of funds, and that Combined had reason to know of their dire circumstances. The record clearly supports an inference that

Combined consciously disregarded the rights of its insured by clinging to its restrictive definition of "accident" as used in its policy.

This intransigent resistance is remarkable in light of the written inducements offered to obtain renewal premiums from Thomas and Evelyn Ainsworth. As stated above, they had carried insurance with Combined since 1969. At trial, documents were introduced which showed that Combined sent "good news letters" to its insureds, assuring them they were covered in the event of "any conceivable accident," incurred in "any activity whatsoever." When the salesman arrived to collect the premiums, he reminded the Ainsworths of the benefits they were receiving, as explained in the news letters. In fact, the salesman's manual defined "accident" simply as "an event that is unforeseen [sic.] and unexpected." Given such information, the Ainsworths could reasonably expect that an unforeseeable, unexpected accident which occurred as a result of a medical test would be covered by their policy. *See* National Union Fire Ins. v. Reno's Exec. Air, 100 Nev. 360, 682 P.2d 1380 (1984); Catania v. State Farm Life Ins. Co., 95 Nev. 532, 598 P.2d 631 (1979).

The relationship of an insured to an insurer is one of special confidence. A consumer buys insurance for security, protection, and peace of mind. Rawlings v. Apodaca, 726 P.2d 565 (Ariz. 1986) *(en banc)*. The insurer is under a duty to negotiate with its insureds in good faith and to deal with them fairly.[1] The insurer may not rely on its own ambiguous contract as the sole basis for denial. *Rawlings, supra*, at 572, *see also* Sullivan v. Dairyland Ins. Co., 98 Nev. 364, 649 P.2d 1357 (1982). To allow such conduct would only encourage ambiguous contracts. Indeed, our law has held that any ambiguity will be construed against the insurance company, and rightly so. N. American Life & Cas. Co. v. Gingrich, 91 Nev. 491, 538 P.2d 163 (1975). Negotiations between a wealthy, sophisticated commercial venturer and a naive consumer cannot be of equal strength. For that reason, the law attempts to render an ambiguous contract fair by making the drafter responsible for ambiguity. The insurance industry is heavily regulated by the state, because it is an important public trust. Along with the profits obtained from insurance premiums, insurers must accept the obligations of good faith and fair dealing imposed by law.

---

[1]The covenant of good faith and fair dealing is implied into every commercial contract. NRS 104.1203. In Nevada, insurance contracts are directly regulated by statutes which prohibit deceptive advertising and other unfair trade practices. See NRS 686A.020; 686A.030(1); 686A.040; 686A.310(1)(b), (c), (e), and (f).

Furthermore, even if the evidence is not sufficient to prove that Combined acted oppressively in avoiding the payment of benefits, we note that in the past we have found malice in fact when the defendant has engaged in wilful and intentional conduct, done in reckless disregard of its possible results, *Nevada Cement, supra,* 89 Nev. at 451, 514 P.2d at 1183; Nevada National Bank v. Huff, 94 Nev. 506, 582 P.2d 364 (1978). Combined's conduct was neither accidental nor simply negligent. In spite of five requests made in 18 months, in spite of the serious nature of its insured's accident, it conducted no independent investigation and utterly failed to evaluate fairly the medical evidence it possessed in its claim file.

Therefore, we conclude that the jury's award of punitive damages was supported by substantial evidence.

## PUNITIVE DAMAGES

Traditionally this court has held that the amount of a punitive damages award was subjective, and therefore best left to the jury's determination. Phillips v. Lynch, 101 Nev. 311, 704 P.2d 1083 (1985); Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962). Recently we have attempted to define the allowable limits of punitive damages in a more objective fashion. Ace Truck v. Kahn, 103 Nev. 503, 746 P.2d 132 (1987). *Ace Truck* described several factors which contribute to an appellate evaluation of a punitive damages award. We conclude, however, that none of these factors prevent us from affirming the award in this case.

First, we note that the financial position of the defendant is still relevant to the determination of the amount of the punitive damages award. The wealth of a defendant is directly relevant to the size of an award, which is meant to deter the defendant from repeating his misconduct as well as' punish him for his past behavior. *See* Midwest Supply, Inc. v. Waters, 89 Nev. 210, 510 P.2d 876 (1973). We note that the award in this case, while large, amounts to only 5 percent of Combined's 1985 net operating gain. The award constitutes only .4 percent of Combined's 1985 total assets. Since we find its business conduct totally unacceptable, we are reluctant to disturb the jury's determination that a sizeable award is necessary to deter Combined from pursuing its inappropriate methods.

Second, we conclude that the culpability and blameworthiness of Combined is considerable, with few mitigating circumstances. Despite repeated requests by the insured, all of which were

accompanied by medical reports, Combined failed to investigate the claim properly. It refused to pay on the basis of one inaccuracy in the initial report, an inaccuracy which was corrected by three later reports. Combined must take full responsibility for the handling of the claim, and its own obstinate refusal to take more appropriate action.

Third, we look to the vulnerability of, and injury suffered by, the offended party. Thomas Ainsworth was in a highly vulnerable position as the result of the devastating consequences of his stroke. Unable to communicate effectively, he depended on the efforts of his wife, a woman who was inexperienced in handling business matters. Sufficient evidence was produced at trial to show that Thomas was permanently impaired in his speaking ability by the lack of crucial funds to pay for speech therapy at the proper time during his recovery. Thomas' injuries prompted the jury to make a substantial award of compensatory damages. These injuries also support an award of punitive damages.

Another factor is the offensiveness of the punished conduct when compared to societal values of justice and propriety. As discussed above, insurance is a special kind of commercial activity. The insurer is under a duty to treat its policyholders fairly. The obstinate, unjustified refusal to pay a legitimate claim is offensive to society, precisely because the consumer pays for insurance to gain security and peace of mind.

Finally, we must evaluate the means judged necessary to deter future misconduct. Combined is a very large, wealthy insurance company which sends its agents out among the innocent citizenry, selling policies door-to-door. Its policyholders are not sophisticated commercial investors; they are ordinary citizens who hope to protect themselves from future calamities. If Combined is to be deterred from its past course of conduct, this can only be done through an assessment of punitive damages. In order to accomplish this purpose, the amount awarded must be sufficient to cause the defendant real concern. We cannot say that an assessment of .4 percent of the respondent's total assets is unwarranted under the circumstances of this case. The award does not shock our judicial conscience, and it is not clearly excessive.[2] Hale v. Riverboat Casino, Inc., 100 Nev. 299, 682 P.2d 190 (1984).

Other contentions have been considered and are deemed to be totally without merit. We therefore reinstate the jury's verdict.

---

[2]Appellant is not entitled to interest on the punitive damages award. *See* Ramada Inns v. Sharp, 101 Nev. 824, 711 P.2d 1 (1985). We understand that the policy benefits and compensatory damages have already been paid. Therefore, no interest is awarded by this decision.

We reverse the grant of judgment notwithstanding the verdict, and affirm the denial of respondent's motion for a new trial.

STEFFEN, YOUNG, SPRINGER, and MOWBRAY, JJ. concur.